```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8-7-14
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
UNITED STATES OF AMERICA, AND THE
STATE OF NEW YORK EX REL.
CORPORATE COMPLIANCE ASSOCIATES,

                              Plaintiffs,                    07 Civ. 292 (PKC)

          -against-                                          MEMORANDUM
                                                             AND ORDER

NEW YORK SOCIETY FOR THE RELIEF OF
THE RUPTURED AND CRIPPLED,
MAINTAINING THE HOSPITAL FOR
SPECIAL SURGERY d/b/a HOSPITAL FOR
SPECIAL SURGERY, JOHN R. REYNOLDS
and MICHAEL H. KEMP,

                              Defendants.
------------------------------------------------------x

CASTEL, U.S.D.J.

          Corporate Compliance Associates ("Corporate Compliance") is the relator in this

qui tam action brought under the False Claims Act, 31 U.S.C. § 3729, et seq. (the "FCA").  Its

Fourth Amended Complaint (the "Complaint") asserts that the defendants orchestrated several

long-running schemes to defraud Medicare and Medicaid by falsely certifying legal compliance

with certain regulatory and statutory obligations.

          Corporate Compliance asserts that, under the direction of its then-CEO John. R.

Reynolds, defendant Hospital for Special Surgery[1] (the "Hospital") paid excessive compensation

to its physicians in order to induce in-house service referrals that inured to the Hospital's

financial benefit.  These alleged physician "kickbacks" came principally in the form of

compensation arrangements that included variations in base salary tied to the physicians' referral

---

[1] The caption identifies the Hospital by its full name, the New York Society for the Relief of the Ruptured and
Crippled, Maintaining the Hospital for Special Surgery d/b/a Hospital for Special Surgery.

volumes, and an annual across-the-board payment for administrative and teaching

responsibilities that the Complaint deems to have been a sham.  The claim is that the Hospital

has linked physician compensation to the volume of in-Hospital service referrals, and, thus,

violated two federal criminal laws: the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and the

Stark Act, 42 U.S.C. § 1395nn(a).  According to the Complaint, the Hospital fraudulently

certified in its government reimbursement forms that it complied with relevant laws and

regulations, when in truth it was in violation of these two statutes.  The Complaint also alleges

that the hospital submitted codes that falsely indicated that certain procedures where performed

in physicians' private offices and not at the Hospital, and sought reimbursement for radiological

procedures at two unlicensed facilities.  It further alleges that defendant Reynolds successfully

solicited kickbacks from an outside billing company owned by defendant Michael H. Kemp.

       The Complaint alleges that the defendants' conduct has caused damage to the

United States in excess of $788,000,000, arising out of hundreds of thousands of false claims.  It

does not quantify the amount of damages incurred by the State of New York as a result of

alleged Medicaid fraud.  If the FCA's treble damages provision were to apply, 31 U.S.C. §

3729(a)(1), the Hospital could be liable for an amount well in excess of $2 billion.  As the qui

tam relator, Corporate Compliance would be entitled to a percentage of any damages it might

recover on behalf of the United States of America and the State of New York, both of which

have declined to intervene in this action.

       The three defendants have filed motions to dismiss pursuant to Rules 9(b) and

12(b)(6), Fed. R. Civ. P.  (Docket # 60, 64, 69.)  For reasons that will be explained, the Court

concludes that the Complaint fails to satisfy the pleading requirements of Rule 9(b).  In reaching

that conclusion, this Court joins others that have concluded that an FCA claim does not satisfy

Rule 9(b) solely by allegations of a fraudulent scheme, but must set forth with particularity the circumstances constituting the fraud as to the claims themselves.

Defendants' motions to dismiss are therefore granted.

BACKGROUND

A.   The Parties.

The Hospital is a not-for-profit corporation that operates a 172-bed orthopedic surgery center and teaching hospital located at 535 East 70th Street.  (Compl't ¶ 29.)  It was founded in 1863, is affiliated with the New York-Presbyterian Healthcare System and Weill Cornell Medical College, and has more than 3,000 full-time employees.  (Compl't ¶ 79.)  The Complaint alleges that the Hospital participates in a competitive New York City healthcare market.  (Compl't ¶¶ 80-81.)

Defendant John R. Reynolds was the Hospital's Chief Financial Officer from 1986 to 1997 and its Chief Executive Officer from 1997 to 2006.  (Compl't ¶ 30.)  According to the Complaint, Reynolds oversaw the implementation of several unlawful schemes in an attempt to boost the Hospital's revenue.  Those alleged schemes are explained in greater detail below. The Complaint asserts that on July 11, 2013, Reynolds pleaded guilty to one count of wire fraud and one count of making false statements to a law enforcement agent.  (Compl't ¶ 18.) According to the indictment in the criminal case, those schemes involved kickbacks of a different kind, which were made for Reynolds's personal gain and were concealed from the Hospital's board of directors; in other words, the Hospital was a victim of Reynolds's misdeeds.[2]

---

[2] The Complaint does not include additional details as to the criminal proceedings against Reynolds.  The charges in his criminal case have minimal overlap with the claims at issue here.  The indictment in United States v. Reynolds, 12 Cr. 708 (S.D.N.Y.) (HB), charged Reynolds with an extortion and kickback scheme whereby he received approximately $1.4 million in illegal kickbacks, while simultaneously concealing his activities from the Hospital's board of directors.  (12 Cr. 708, Docket # 2.)  Specifically, the indictment charged Reynolds with receiving

The late Judge Harold Baer sentenced Reynolds to 18 months' imprisonment on November 7, 2013.  (Compl't ¶ 18.)  Corporate Compliance alleges that, due to Reynolds's misconduct, the Hospital submitted claims and cost reports to the United States and the State of New York that falsely certified that the Hospital and its physicians received Medicare and Medicaid reimbursements in compliance with governing laws.  (Compl't ¶ 19.)

Defendant Michael H. Kemp is the former owner of Professional Billing Controls, Inc. ("PBC"), an outside firm that provided billing services to the Hospital.  (Compl't ¶ 31.)  As will be discussed in greater detail, Corporate Compliance alleges that Kemp and PBC paid monthly kickbacks to Reynolds in exchange for the Hospital's billing-services contracts. (Compl't ¶ 138.)

Corporate Compliance is the qui tam relator.  Corporate Compliance describes itself as a Delaware general partnership, and makes no allegations as to its business or its operations; it does not allege any relationship to the Hospital.  (Compl't ¶ 28.)  It appears that its claims are based in part on information obtained from unnamed former officers employed by the Hospital, including its former Chief Compliance Officer and its former Associate Vice President of Physician Services.

---

$420,000 in illegal kickbacks from outside billing vendors in exchange for securing their business with the Hospital; requiring a subordinate hospital employee to pay Reynolds half of the employee's own annual bonuses, totaling approximately $298,500; and successfully soliciting approximately $670,000 in payments from a United Kingdom hospital in exchange for securing it a business partnership with the Hospital.  (12 Cr. 708, Docket # 2.)  The Indictment charged Reynolds with one count of racketeering and one count of making false statements to the government.  (12 Cr. 708, Docket # 2.)  Following issuance of a Superseding Information, Reynolds pleaded guilty to one count of wire fraud and one count of making false statements to the government, and Judge Baer sentenced him to 18 months of imprisonment for each count, with the sentences to run concurrently.  (12 Cr. 708, Docket # 33.)  Aside from the charges related to the Hospital's business with outside billing vendors, the charges in the criminal action do not overlap with the theories of liability proposed by Corporate Compliance.

B.  <u>Alleged Kickbacks to Solicit Physician Inducements for Hospital Referrals.</u>

As noted, much of the Complaint is directed toward an alleged scheme whereby the Hospital paid excessive compensation to its physicians in order to induce them to make referrals for patient services within the Hospital.  The Complaint alleges that the Hospital sought to enhance its profits by ensuring that lucrative procedures were performed within the Hospital's own facilities and not at other institutions.  It again bears emphasizing that the Complaint's theory of liability is premised on the Hospital's legal certifications that its submissions for reimbursement complied with applicable laws.

According to the Complaint, the Hospital sought to increase its profits from facilities-based revenue.  Corporate Compliances alleges that because the Hospital has a limited number of beds, it generates substantial revenue from offices visits, surgeries, diagnostic services and rehabilitation services.  (Compl't ¶ 4.)  The Hospital's physicians bill patients for services such as visits and surgeries, but, separately, the Hospital bills patients for the use of facilities associated with those services, such as access to operating rooms, diagnostic equipment and supplies.  (Compl't ¶ 4.)  Corporate Compliances labels the Hospital's facilities-based revenue as "derivative revenue."  (Compl't ¶ 4.)

Corporate Compliance asserts that the Hospital provided monetary incentives to physicians in order to induce and encourage referrals that brought the Hospital derivative revenue.  (Compl't ¶ 5.)  In calculating such physician payments, the Hospital allegedly considered the value and volume of physician referrals.  (Compl't ¶ 5.)  The Hospital and the physicians then submitted claims to Medicaid and Medicare for reimbursement.  (Compl't ¶ 5.)

The Hospital's compensation arrangements varied based on whether a doctor was classified as a "contract physician" or an "independent physician."

1.   The Compensation Arrangement for Contract Physicians.

The Hospital paid contract physicians both a salary and a percentage of their billings.  (Compl't ¶¶ 7, 92.)  According to the Complaint, salary and billing percentage varied based on the amount of derivative revenue that the physician generated to the Hospital.  (Compl't ¶ 8.)  The base salaries of contract physicians ranged from $200,000 to $750,000.  (Compl't ¶ 92.)  Contract physicians received other on-the-job benefits, including payment of administrative costs and malpractice insurance.  (Compl't ¶ 92.)

Because contract physicians referred "nearly 100% of their patients to [the Hospital's] operating rooms," derivative revenue substantially underwrote physician salaries.  (Compl't ¶ 9.)  According to the Complaint, the Hospital heavily weighed the amount of derivative revenue generated by a contract physician when it calculated salaries.  (Compl't ¶ 96.)  The greater the derivative revenue, the higher the physician salary.  (Compl't ¶ 96.)  The Complaint names two specific physicians who allegedly received variable compensation in 2002 and 2003 based on the number of surgeries that they performed and the corresponding derivative revenue gained by the Hospital.  (Compl't ¶¶ 98-100.)  Were it not for physician referrals, the resulting derivative revenue and the corresponding reimbursement from Medicare and Medicaid, the Complaint alleges, the Hospital would have been "subsidizing" physician salaries, because the revenue generated solely through the physicians' professional billings was less than their salaries.  (Compl't ¶¶ 9-10, 101-07.)

2.   The Hospital's Use of Independent Physicians.

According to Corporate Compliance, the Hospital "tried to push" contract physicians who generated low derivative revenue into reclassification as "independent physicians."  (Compl't ¶¶ 109-11.)  Independent physicians received 100% of their own billings.

(Compl't ¶¶ 12, 115.)  Independent physicians also had access to hospital facilities and support staff.  (Compl't ¶ 94.)

### 3.   The Hospital's Use of CARA Payments.

Both contract physicians and independent physicians received annual payments of $80,000 for work spent performing clinical, administrative, research and academic services – so-called "CARA Payments."  (Compl't ¶ 120.)  Corporate Compliance asserts that these payments amounted to kickbacks that were paid in exchange for physician referrals to the Hospital, and that the extra duties for which physicians received compensation did not warrant the $80,000 annual payments.

According to the Complaint, the CARA payments themselves are evidence of FCA liability due to the Hospital's uniform use of them.  (Compl't ¶ 121.)  Each physician received an $80,000 flat fee for CARA duties, despite variations in the amount of CARA work that each performed.  (Compl't ¶ 121.)  Corporate Compliance asserts that the "majority" of physicians did not perform CARA work to justify these payments, were not expected to do so, and that the Hospital did not account for the amount of time spent on CARA activities.  (Compl't ¶¶ 122-23.)  It alleges that the number of physicians receiving CARA payments continued to grow, even as the number of interns and residents requiring instruction held steady.  (Compl't ¶ 124.)  For instance, according to the Complaint, from 1996 to 2013, the Hospital increased its number of orthopedic surgeons from 40 to 100, while the number of interns and residents remained consistent.  (Compl't ¶¶ 125-26.)  During this time, all physicians continued to receive $80,000 in annual CARA payments.  (Compl't ¶ 127.)

Similarly, Corporate Compliance contends that as the number of surgeons available to perform clinical work with indigent patients grew dramatically, the volume of

indigent clinical work at the Hospital declined.  (Compl't ¶ 129.)  Medical care for the indigent falls within the clinical duties for which doctors receive CARA payments.  As evidence of the Hospital's declining work with indigent patients, Corporate Compliance asserts that Medicaid revenue decreased from 5.71% of overall Hospital revenue in 2000 to 2% in 2010.  (Compl't ¶ 129.)  The Complaint estimates that the Hospital provides less than half the volume of Medicaid clinical care than it did ten years ago while its number of available physicians more than doubled, with all physicians receiving CARA payments.  (Compl't ¶ 131.)

4.   The Hospital's Payments to Physicians with Administrative Titles.

Corporate Compliance also describes the Hospital as being "'top-heavy' with executives and administrators."  (Compl't ¶ 132.)  The Hospital allegedly employed more administrators than peer institutions that offered a wider breadth of services.  (Compl't ¶ 132.)  According to the Complaint, approximately 12.9% of the Hospital's full-time employees are administrators, compared to 6.9% of employees at Montefiore Hospital.  (Compl't ¶¶ 133-34.)  The Complaint asserts that the Hospital's physicians received remuneration for job titles that included departmental "chief," "head" or "director," despite performing no additional services.  (Compl't ¶ 135.)  According to the Complaint, the Hospital's "Service Chiefs" were paid $160,000 without shouldering additional responsibilities.  (Compl't ¶ 136.)  The Complaint asserts that the added compensation that came with these administrative titles induced more referrals to bring derivative revenue to the Hospital.  (Compl't ¶ 137.)

C.   Outside Billing Companies' Alleged Kickbacks to Reynolds.

Corporate Compliance asserts that Reynolds orchestrated an illegal kickback arrangement with PBC, an outside company that provided billing services to the Hospital.  (Compl't ¶ 16.)  It asserts that from 1990 through 2002, defendant Reynolds orchestrated a "pay

to play scheme" wherein he solicited and received monthly payments from vendors in exchange for securing billing business to those vendors from the Hospital and its contract physicians. (Compl't ¶¶ 16-17.)

According to the Complaint, defendant Kemp, the owner of PBC, paid monthly kickbacks to Reynolds in exchange for an agreement to provide outside billing services to the Hospital. (Compl't ¶ 138.) This scheme ended in late 2002, when Kemp sold PBC to another firm. (Compl't ¶ 140.) Corporate Compliance alleges that in 2005, Kemp admitted to an officer at PBC's successor firm that he made monthly payoffs to Reynolds, beginning in the mid-1990s, and that Reynolds initiated the arrangement. (Compl't ¶ 141.) According to the Complaint, PBC issued monthly checks to a consulting company that Reynolds owned; Reynolds then endorsed the checks and deposited them in his consulting company's bank account. (Compl't ¶ 142.) The Complaint asserts upon information and belief that Reynolds had similar arrangements with other companies that provided billing services. (Compl't ¶ 144.) It asserts that the Hospital was negligent in failing to discover Reynolds's kickback schemes. (Compl't ¶ 145.) As a consequence, the Hospital paid artificially inflated billing services. (Compl't ¶ 148.)

      D.   <u>Fees from Affiliated, Unlicensed Facilities.</u>

Corporate Compliance asserts that the Hospital unlawfully received government reimbursement for work performed at unlicensed radiology facilities. (Compl't ¶¶ 20-21.) Specifically, the Hospital's physicians performed radiology procedures at two off-site facilities that the Hospital owned. (Compl't ¶¶ 153-55.)

According to Corporate Compliance, these facilities were not licensed under New York's Public Health Law Article 28 and its implementing regulations. (Compl't ¶¶ 20-21, 157.) The Complaint asserts that a facility licensed under Article 28 may bill and collect office-based

- 9 -

fees and facility fees, but an unlicensed facility may collect only for office-based fees.  (Compl't ¶ 156.)  According to the Complaint, the Hospital was aware that these two off-site facilities were not Article 28-compliant, but it nevertheless allowed them to bill facilities fees for their radiology services.  (Compl't ¶ 158-59.)  At the same time, the Hospital was billing government healthcare programs for facilities fees that were incurred at these unlicensed facilities.  (Compl't ¶ 160.)  According to Corporate Compliance, by asserting that it was in compliance with governing laws and regulations, while performing radiology services at these two unlicensed facilities, the Hospital submitted false claims to Medicare and Medicaid in violation of the state and federal false claims acts.  (Compl't ¶ 161.)

  E. <u>The Improper Use of Billing Codes.</u>

   The Center for Medicare and Medicaid Services (the "CMS"), an agency within the Department of Health and Human Services (the "HHS"), administers Medicare and Medicaid.  (Compl't ¶¶ 26, 162.)  Under CMS regulations, certain medical services are subject to different fees depending on the "place where the services are rendered."  (Compl't ¶¶ 26, 162.)  Physicians are paid more for services rendered in their private offices because they incur additional overhead costs that they would not incur in a hospital setting.  (Compl't ¶ 162.)  If a service is provided in a hospital or "hospital-based setting," the hospital may receive a separate "facility fee" for reimbursement.  (Compl't ¶ 162.)  The CMS requires physicians and other Medicare Part B providers to submit a CMS-1500 Form as a condition for these reimbursements.  (Compl't ¶ 163.)

   Physicians and hospitals must make required factual representations on the CMS Form 1500.  (Compl't ¶ 164.)  They must specify a "place of service," and identify whether it was an office, inpatient hospital or outpatient hospital.  (Compl't ¶ 164.)  According to the

Complaint, in their CMS Form 1500 submissions, physicians employed by the Hospital stated

that they rendered Medicare Part B services in private offices, and not in settings owned,

operated and paid for by the Hospital.  (Compl't ¶ 165.)  Corporate Compliance asserts that the

Hospital and its physicians deliberately misstated the place of service in order to receive higher

reimbursement payments.  (Compl't ¶¶ 165-66.)  It estimates that from 1996 to 2006, the

Hospital's physicians filed approximately 335,000 CMS 1500 Forms, falsely stating that they

performed medical services in private offices.  (Compl't ¶ 167.)  The Complaint alleges that

Medicare over-reimbursed those physicians by approximately $8.5 million.  (Compl't ¶ 167.)

Corporate Compliance also asserts that the Hospital used false place-of-service codes to receive

reimbursements from New York Medicaid using the same scheme.  (Compl't ¶ 169-71.)

> F.  Claims Asserted in the Complaint.

According to the Complaint, from 1996 through 2008, the Hospital received

$701,656,105 in Medicare Part A reimbursements and $87,141,892 in Medicare Part B

reimbursements, for a total of $788,797,997 in reimbursements.  (Compl't ¶ 183.)  The

Complaint does not allege the amount of reimbursements that the Hospital received from

Medicaid.  (Compl't ¶ 183.)

The Complaint alleges nine claims for relief.  It asserts that the Hospital presented

false claims for payment under Medicare and Medicaid, and made or used false records in

seeking approval for those claims, thereby violating the False Claims Act, 31 U.S.C. §

3729(a)(1)(A)-(B).  (Claims One and Two, Compl't ¶¶ 184-193.)  It asserts that all defendants

unlawfully engaged in illegal kickback schemes that violated the Anti-Kickback Statute and the

Stark Act, thus violating the FCA, 31 U.S.C. § 3729(a)(1)(A), by certifying in Medicare and

Medicaid reimbursement forms that defendants complied with state and federal laws.  (Claim

Three, Compl't ¶¶ 194-198.)  Claims Four through Six assert that defendants conspired to violate

the FCA, in violation of 31 U.S.C. § 3729(a)(1)(C).  (Compl't ¶¶ 199-219.)  Claims Seven

through Nine assert that the defendants violated the New York False Claim Act, N.Y. Fin L. §

189(1)(a)-(b).  (Compl't ¶¶ 220-34.)

> G.  Procedural History.

On January 12, 2007, Corporate Compliance filed this qui tam action pursuant to

the FCA.  (Docket # 1; Hospital Mem. at 1.)  The Complaint remained under seal while the

United States and the State of New York investigated the allegations.  (Hospital Mem. at 1.)

While the case was under seal, Corporate Compliance twice amended the Complaint.  (Docket #

29, 58.)  On June 11, 2013, the United States filed a notice of election to decline intervention,

and the State of New York declined intervention on the following day.  On July 11, 2013, this

Court ordered the Complaint to be unsealed and served on the defendants within 30 days.

(Docket # 25.)  The pleadings remained sealed until October 30, 2013, and were served to the

defendants on November 19, 2013.  (Docket # 34.)  Corporate Compliance filed its third

amended complaint on November 18, 2013 and its Fourth Amended Complaint on January 8,

2014.  (Docket # 29, 59.)

In its memorandum of law in opposition to the Hospital's motion, Corporate

Compliance asserts that during the course of its investigation of the allegations, the United States

issued a Civil Investigative Demand (the "CID") to the Hospital.  (Opp. Mem. at 1.)  Corporate

Compliance states that it reviewed and analyzed these documents upon the government's

request, and that the United States instructed Corporate Compliance not to undertake additional

investigation while the Complaint was under seal.  (Opp. Mem. at 1-2.)  Once the United States

completed its investigation, Corporate Compliance returned all CID materials, and followed the

government's express instruction not to incorporate facts learned from the CID into the Complaint.  (Opp. Mem. at 2.)

According to the Hospital, during the time between the filing of the United States's notice not to intervene and the unsealing of the complaint, Corporate Compliance unlawfully disclosed the existence of this action to at least three individuals, and unlawfully sought their assistance in gathering evidence relevant to the case.  (<u>See</u> Reday Aff.; Fullerton Aff.; Kemp Aff.)

MOTION TO DISMISS STANDARDS UNDER RULES 9(b) AND 12(b)(6), FED. R. CIV. P.

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Rule 9(b), Fed. R. Civ. P.  To plead a fraudulent misstatement, "the plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  <u>Anschutz Corp. v. Merrill Lynch & Co., Inc.</u>, 690 F.3d 98, 108 (2d Cir. 2012) (internal quotation marks omitted).

Because the False Claims Act is an anti-fraud statute, "claims brought under the FCA fall within the express scope of Rule 9(b)."  <u>Gold v. Morrison-Knudsen Co.</u>, 68 F.3d 1475, 1476-77 (2d Cir. 1995); <u>accord</u> <u>Chapman v. Office of Children & Family Services of the State of New York</u>, 423 Fed. Appx. 104 (2d Cir. 2011) (summary order) ("[T]he False Claims Act is an antifraud statute, so <u>qui</u> <u>tam</u> actions under the Act must satisfy the heightened pleading requirements of Rule 9(b)."); <u>Wood ex rel. United States v. Applied Research Assocs., Inc.</u>, 328 Fed. Appx. 744 (2d Cir. 2009) (summary order) ("Because it is self-evident that the FCA is an anti-fraud statute and therefore claims brought under the FCA fall within the express scope of

Rule 9(b), [the relator's] Amended Complaint must also meet the heightened pleading standard of Fed. R. Civ. P. 9(b).") (internal citation and alterations omitted).

While the text of the FCA expressly states that it does not require "proof of specific intent to defraud," 31 U.S.C. § 3729(b)(1)(B), "this does not conflict with Rule 9(b)," since "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Gold, 68 F.3d at 1477. Rather, to satisfy Rule 9(b), a complaint must "state with particularity the specific statements or conduct giving rise to the fraud claim." Id.

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In assessing a complaint, courts draw all reasonable inferences in favor of the non-movant. See In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007). Legal conclusions, however, are not entitled to the presumption of truth, and a court assessing the sufficiency of a complaint disregards them. Iqbal, 556 U.S. at 678. Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679.

DISCUSSION

I.   Overview of the FCA.

The FCA facilitates restitution to the federal government when money is fraudulently taken from it. See United States ex rel. Feldman v. van Gorp, 697 F.3d 78, 87 (2d Cir. 2012). "Congress enacted the [FCA] in 1863 'with the principal goal of stopping the massive frauds perpetrated by large [private] contractors during the Civil War.'" United States

- 14 -

ex rel. Lissack v. Sakura Global Capital Markets, Inc., 377 F.3d 145, 151-52 (2d Cir. 2004)

(quoting Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765,

781 (2000)).  Under the FCA, "[t]he defendant is liable for treble damages, in other words, three

times the amount of damages the government sustained on account of defendant's actions, and a

civil penalty of up to $10,000 for each claim."  United States ex rel. Drake v. Norden Sys., Inc.,

375 F.3d 248, 251 (2d Cir. 2004) (citing 31 U.S.C. § 3729(a)).

        In 1986, the FCA was amended to encourage citizens to bring more private

enforcement actions.  See Manning v. Utilities Mutual Ins. Co., 254 F.3d 387, 397 (2d Cir.

2001).  The Fraud Enforcement and Recovery Act of 2009 ("FERA") amended the FCA to

expand the scope of liability when a person knowingly makes a false claim, whether or not the

party deals directly with the government.  See generally United States ex rel. Kester v. Novartis

Pharmas. Corp., 2014 WL 2324465, at *6-7 (S.D.N.Y. May 29, 2014) (McMahon, J.)

(summarizing FERA amendments).  The FCA permits a relator to bring a qui tam action "for a

violation of section 3729 for the person and for the United States Government.  The action shall

be brought in the name of the Government."  31 U.S.C. § 3730(b)(1).  "[W]hile the False Claims

Act permits relators to control the False Claims Act litigation, the claim itself belongs to the

United States."  United States ex rel. Mergent Services v. Flaherty, 540 F.3d 89, 93 (2d Cir.

2008).  At the same time, "the United States is a 'party' to a privately filed FCA action only if it

intervenes in accordance with the procedures established by federal law."  United States ex rel.

Eisenstein v. City of New York, 556 U.S. 928, 933 (2009).[3]  If the United States declines to

---

[3] The Complaint incorrectly identifies the United States and the State of New York as plaintiffs.  (Compl't ¶¶ 26-27.)  But the Supreme Court has distinguished the United States's role as the "party in interest" in a qui tam FCA action from its role as plaintiff when it elects to intervene.  Eisenstein, 556 U.S. at 932-37.  "Congress expressly gave the United States discretion to intervene in FCA actions – a decision that requires consideration of the costs and benefits of party status."  Id. at 933. "The Court cannot disregard that congressional assignment of discretion by

intervene, and the relator successfully pursues the action, the relator may receive between 25 and 30 percent of any recovery.  31 U.S.C. § 3730(d)(2).

The relator must serve the government with the complaint and provide the government with all relevant evidence in the relator's possession.  31 U.S.C. § 3730(b)(2).  For good cause shown, the government may move for extensions of the time to determine whether to intervene, during which the complaint remains under seal.  31 U.S.C. § 3730(b)(3).  If the government does not proceed with the action, "the person who initiated the action shall have the right to conduct the action."  31 U.S.C. § 3730(c)(3).

One provision of the FERA amendments to the FCA, 31 U.S.C. § 3729(a)(1)(B), which makes it unlawful for a person to "knowingly make[ ], use[ ], or cause[ ] to be made or used, a false record or statement material to a false or fraudulent claim," applies retroactively to any claim pending before a court on or after June 27, 2008.  United States ex rel. Kirk v. Schindler Elevator Corp., 601 F.3d 94, 113 (2d Cir. 2010), rev'd on other grounds, 131 S. Ct. 1885 (2011).  Two other amended FERA provisions, subsections 3279(a)(1) and (a)(3), became effective on May 20, 2009.  See Kester, 2014 WL 2324465, at *7.  With the exception of section 3279(a)(1)(B), the pre-FERA version of the FCA applies to the relator's claims.

The relator may bring an action against any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States . . . a false or fraudulent claim for payment or approval . . . ."  31 U.S.C. § 3729(a)(1) (2007).  A relator also may bring claims against any person who "knowingly makes, uses or causes to be made or used, a false

---

designating the United States a 'party' even after it has declined to assume the rights and burdens attendant to full party status."  Id. at 934.  "A person or entity can be named in the caption of a complaint without necessarily becoming a party to the action."  Id. at 935.  By contrast, "[t]he phrase, 'real party in interest,' is a term of art utilized in federal law to refer to an actor with a substantive right whose interests may be represented in litigation by another."  Id. at 934-35.  Therefore, while New York and the United States are real parties in interest, they have elected not to intervene, and are not plaintiffs to this action.

record or statement to get a false or fraudulent claim paid or approved by the Government."  31 U.S.C. § 3729(a)(2) (2007).  The FCA makes it unlawful to "conspire[ ] to defraud the Government by getting a false or fraudulent claim allowed or paid . . . ."  31 U.S.C. § 3729(a)(3) (2007).  In using the words "knowing" and "knowingly," the FCA "require[s] no proof of specific intent to defraud."  31 U.S.C. § 3729(b)(1)(B) (2014).  Rather, the words "mean that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information . . . ."  31 U.S.C. § 3729(b)(1)(A) (2014).[4]

The FCA makes it unlawful to falsely certify legal compliance if such compliance is a condition for government payment.  Mikes v. Straus, 274 F.3d 687, 698 (2d Cir. 2001).  An actionable false legal certification may be express or implied.  Id. at 698-700.  For the purposes of this motion, it is important to distinguish between an express and implied false legal certification.  "An expressly false claim is, as the term suggests, a claim that falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment."  Id. at 698.  By contrast, "[a]n implied false certification claim is based on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment."  Id. at 699.  According to Corporate Compliance, each of the Hospital's claims for payment from Medicare or Medicaid "was accompanied by an express or implied certification that the transaction was not in violation of federal or state statutes, regulations, or program rules."  (Compl't ¶ 181.)

The motions turn in large part on whether Corporate Compliance has adequately alleged violations of two federal criminal laws: the Anti-Kickback Statute and the Stark Law.

---

[4] The FCA's pre-FERA definition of "knowingly" was identical, but codified under a different subsection, 31 U.S.C. § 3729(b) (2007).

The Anti-Kickback Statute makes it a felony to knowingly and willfully solicit or receive remuneration in exchange for referring an individual for "any item or service for which payment may be made in whole or in part under a Federal health care program," or to solicit or receive payment in exchange for purchasing or arranging use of a service or facility entitled to remuneration under a federal health care program. 42 U.S.C. § 1320a-7b(b). The prohibition excludes "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services." 42 U.S.C. § 1320a-7b(b)(3)(B). A 2010 amendment to the Anti-Kickback Statute, which became effective on January 1, 2011, states that a claim for services that violates the Anti-Kickback Statute also violates the FCA. 42 U.S.C. § 1320a-7b(g). That amendment contains no retroactivity provision. The AKS does not create a private right of action. See, e.g., Donovan v. Rothman, 106 F. Supp. 2d 513, 516 (S.D.N.Y. 2000) (Stein, J.).

The Stark Law, 42 U.S.C. § 1395nn(a), prohibits physician self-referrals for certain designated services, if those services are subject to reimbursement from Medicare or Medicaid. "In an effort to contain health care costs and reduce conflicts of interest, Congress passed legislation in 1989 and 1993 that prohibits physicians from referring their Medicare and Medicaid patients to business entities in which the physicians or their immediate family members have a financial interest." Fresenius Med. Care Holdings, Inc. v. Tucker, 704 F.3d 935, 937 (11th Cir. 2013). The Stark Law's prohibition applies only if the physician has a "financial relationship" with the entity that receives the referral. 42 U.S.C. § 1395nn(a)(1). A "financial relationship" can include "a compensation arrangement . . . between the physician . . . and the entity" that receives the referral. 42 U.S.C. § 1395nn(a)(2)(B); see also 42 U.S.C. § 1395nn(h)(1)(A) ("The term 'compensation arrangement' means any arrangement involving any

remuneration between a physician (or an immediate family member of such physician) and an entity other than an arrangement involving only remuneration described in subparagraph (C).")

While a "compensation arrangement" is required for a Stark Law violation, a bona fide employer exception applies if the physician is employed for identifiable services, receives compensation consistent with fair-market value and the arrangement is "commercially reasonable."  42 U.S.C. § 1395nn(e)(2)(B)-(C).  Physician compensation may not be based on the "volume or value" of physician referrals.  Id. § 1395nn(e)(2)(B)(iii); 42 C.F.R. § 411.351. The definition of "referrals" also excludes "any designated health service personally performed or provided by the referring physician."  42 C.F.R. § 411.351.

Separately, the Complaint also asserts claims under the NYFCA.  "The NYFCA follows the federal False Claims Act . . . ."  State of New York ex rel. Seiden v. Utica First Ins. Co., 96 A.D. 3d 67, 71 (1st Dep't 2012); accord United States ex rel. Qazi v. Bushwick United Housing Development Fund Corp., 977 F. Supp. 2d 235, 242 (E.D.N.Y. 2013) (Cogan, J.) (the NYFCA "is closely modeled on the federal FCA.").  New York courts rely on federal FCA precedents when interpreting the NYFCA.  See Seiden, 96 A.D.3d at 71-72; People ex rel. Schneiderman v. Bank of N.Y. Mellon Corp., 40 Misc.3d 1232(A), at *28-31 (N.Y. Sup. Ct. N.Y. Cnty. 2013) (citing FCA precedents from numerous United States courts of appeals to interpret the NYFCA).  With the exception of conflicting interpretations of the NYFCA's limitations period and its potential retroactivity – an issue that the Court does not reach in this Memorandum and Order – the parties do not contend that application of the NYFCA differs here from application of the FCA.  Therefore, this Court's conclusions as to the federal FCA apply in full to the relator's claims under the NYFCA.

II.     The Complaint Fails to Satisfy Rule 9(b).

The Hospital argues that the Complaint fails to satisfy Rule 9(b) because it does not identify the defendants' allegedly false claims.  See generally United States ex rel. Clausen v. Laboratory Corp. of America, Inc., 290 F.3d 1301, 1311-12 (11th Cir. 2002) (to satisfy Rule 9(b), FCA the complaint must allege with particularity that false claims were actually submitted). Corporate Compliance argues that in FCA cases, Rule 9(b) requires only allegations that go to the particulars of an overall fraudulent scheme, but that there is no obligation to allege the particulars of the false claims themselves.  See generally United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 188-89 (5th Cir. 2009).  Corporate Compliance's memorandum in opposition characterizes the approach adopted in the Fifth Circuit by Grubbs as "[t]he prevailing standard" for pleading FCA claims.  (Opp. Mem. at 4.)

After reviewing the parties' arguments, the various approaches of the United States courts of appeals and the decisions of the courts of the Second Circuit, this Court concludes that to satisfy Rule 9(b), an FCA claim must allege the particulars of the false claims themselves, and that allegations as to the existence of an overall fraudulent scheme do not plead fraud with particularity.

The Court first reviews the line of authority supporting Corporate Compliance's contention that Rule 9(b) does not require allegations as to the contents of false claims.  Grubbs observed that the elements of a claim under the FCA differ from those of common-law fraud and securities fraud, and that the application of Rule 9(b) varies accordingly.  565 F.3d at 188-89. Because common-law fraud includes reliance and damage as elements, the specific contents of an alleged misstatement must be set forth in order to allege that the plaintiff relied on the

misstatement to its detriment.  Id.  However, in the view of the Fifth Circuit, fraud under the

FCA differs from other forms of fraud:

> The False Claims Act, in contrast, lacks the elements of reliance and
> damages.  Rather, it protects the Treasury from monetary injury.  Put
> plainly, the statute is remedial and exposes even unsuccessful false
> claims to liability.  A person that presented fraudulent claims that
> were never paid remains liable for the Act's civil penalty.  It is
> adequate to allege that a false claim was knowingly presented
> regardless of its exact amount; the contents of the bill are less
> significant because a complaint need not allege that the Government
> relied on or was damaged by the false claim.  Thus, a claim under
> the False Claims Act and a claim under common law or securities
> fraud are not on the same plane in meeting the requirement of
> "stat[ing] with particularity" the contents of the fraudulent
> misrepresentation.

Id. at 189.  Grubbs noted that to succeed at trial, a qui tam relator could "offer[ ] particular and

reliable indicia that false bills were actually submitted as a result of the scheme," including

evidence of standard billing procedures and dates of services provided, without providing "the

particular contents of the misrepresentation."  Id. at 189-90.  "To require these details at pleading

is one small step shy of requiring production of actual documentation with the complaint, a level

of proof not demanded to win at trial and significantly more than any federal pleading rule

contemplates."  Id. at 190.

> The Third, Tenth, Ninth and Seventh Circuits have adopted standards similar to

Grubbs, and do not require a complaint to plead the contents or details of allegedly false claims.

See Foglia v. Renal Ventures Mgt., LLC, 754 F.3d 153, 155-57 (3d Cir. 2014) (adopting Grubbs)

United States ex rel. Lemmon v. Envirocare of Utah, Inc., 614 F.3d 1163, 1172 (10th Cir. 2010)

("claims under the FCA need only show the specifics of a fraudulent scheme and provide an

adequate basis for a reasonable inference that false claims were submitted as part of that

scheme."); Ebeid ex rel. United States v. Lungwitz, 616 F.3d 993, 998-99 (9th Cir. 2010)

(adopting Grubbs); United States ex rel. Lusby v. Rolls-Royce Corp., 570 F.3d 849, 854 (7th Cir. 2009) (Rule 9(b) does not require a relator to cite false invoices or representations at the outset of a litigation, but must raise a plausible inference that false claims were filed).  At least one judge in this District has relied, albeit in dictum, on Grubbs's pleading standard.  See United States ex rel. Resnick v. Weill Medical College at Cornell University, 2010 WL 476707, at *5 (S.D.N.Y. Jan. 21, 2010) (Pauley, J.) (FCA claim may satisfy Rule 9(b) without alleging details of a false claim, provided that it alleges "'particular details of a scheme paired with reliable indicia that lead to a strong inference that claims were actually submitted'") (quoting Grubbs); see also United States ex rel. Schumann v. AstraZeneca PLC, 2010 WL 4025904, at *9-10 (E.D. Pa. Oct. 13, 2010) (the complaint "need only show" the existence of a false scheme and raise a reasonable inference that false claims were submitted).

By contrast, in Clausen, the Eleventh Circuit concluded that it is insufficient "merely to describe a private scheme in detail" without also including allegations that go to the "specific occurrences of a false claim."  290 F.3d at 1311.  Clausen requires the dates that the claims were submitted, the amounts charged in the claims, their allegedly false contents and the defendants' standard billing practices.  Id. at 1311-13.  Such particularity provides a safeguard against "speculative suits" premised on "guilt by association."  Id. at 1308.  "And, regardless of whether the elements or descriptions of a False Claims Act action are precisely the same as common-law fraud, this Court has never required such overlap as a prerequisite for the application of Rule 9(b) to parallel statutory realms."  Id. at 1309.  Clausen concluded that "[w]e cannot make assumptions about a False Claims Act defendant's submission of actual claims to the Government without stripping all meaning from Rule 9(b)'s requirement of specificity or

ignoring that the 'true essence of the fraud' of a False Claims Act action involves an actual claim for payment and not just a preparatory scheme." Id. at 1312 n.21.

      The Eleventh Circuit has re-affirmed the reasoning of Clausen, explicitly stating that it "disagree[d]" with "other cases apply[ing] a more relaxed construction of Rule 9(b) . . . ." United States ex rel. Nathan v. Takeda Pharmas. N. Am., Inc., 707 F.3d 451, 457-58 (11th Cir. 2013). Nathan emphasized that "when a defendant's actions, as alleged and as reasonably inferred from the allegations, could have led, but need not necessarily have led, to the submission of false claims, a relator must allege with particularity that specific false claims actually were presented to the government for payment." Id. at 457 (emphasis in original).[5] "In reaching this conclusion, we acknowledge the practical challenges that a relator may face in cases such as the present one, in which a relator may not have independent access to records such as prescription invoices, and where privacy laws may pose a barrier to obtaining such information without court involvement." Id. at 458.

      Relying on Clausen, the First Circuit observed that the existence of a false claim is at the heart of the FCA. United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 232 (1st Cir. 2004), abrogated on other grounds, Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662 (2008). Karvelas concluded that because liability under the FCA turns on the filing of a false claim, Rule 9(b) requires a complaint to allege particulars of the claim itself:

> Underlying schemes and other wrongful activities that result in the submission of fraudulent claims are included in the "circumstances constituting fraud or mistake" that must be pled with particularity pursuant to Rule 9(b). However, such pleadings invariably are inadequate unless they are linked to allegations, stated with particularity, of the actual false claims submitted to the government

---

[5] Nathan also observed that, in the Grubbs case, the complaint alleged dates of physician services that were never provided by physicians, and that the detailed allegations of a hospital's fraudulent internal records supported a strong inference that the non-existent services were billed to Medicare. Id. at 457. No such allegations were made in Nathan, and none are made by Corporate Compliance in this case.

> that constitute the essential element of an FCA qui tam action.  . . .
> In a case such as this, details concerning the dates of the claims, the
> content of the forms or bills submitted, their identification numbers,
> the amount of money charged to the government, the particular
> goods or services for which the government was billed, the
> individuals involved in the billing, and the length of time between
> the alleged fraudulent practices and the submission of claims based
> on those practices are the types of information that may help a
> relator to state his or her claims with particularity.  These details do
> not constitute a checklist of mandatory requirements that must be
> satisfied by each allegation included in a complaint.  However, like
> the Eleventh Circuit, we believe that "some of this information for
> at least some of the claims must be pleaded in order to satisfy Rule
> 9(b)."

Id. at 232-33 (quoting Clausen, 290 F.3d at 1312 n. 21); cf. United States ex rel. Quinn v.

Omnicare Inc., 382 F.3d 432, 440 (3d Cir. 2004) (relator's failure to submit evidence of a single

claim required defendants' summary judgment motion to be granted).

      Other district courts within this Circuit have rejected Grubbs in favor of an

approach consistent with Clausen or Karvelas.  United States ex rel. Mooney v. Americare, Inc.,

2013 WL 1346022, at *3 (E.D.N.Y. Apr. 3, 2013) (collecting cases); United States ex rel. Siegel

v. Roche Diagnostics, Corp., 988 F. Supp. 2d 341, 346 (E.D.N.Y. 2013) (Spatt, J.) (requiring "a

heightened standard with respect to pleading an actual claim under the FCA"); United States ex

rel. Moore v. GlaxoSmithKline, LLC, 2013 WL 6085125, at *5 (E.D.N.Y. October 18, 2013)

(Cogan, J.) (FCA liability "cannot be adequately pleaded absent particularized allegations

concerning the actual false claims submitted to the government."); United States ex rel. Polansky

v. Pfizer, 2009 WL 1456582, at *5 (E.D.N.Y. May 22, 2009) (Korman, J.) ("a relator cannot

circumscribe the Rule 9(b) pleading requirements by alleging a fraudulent scheme in detail and

concluding, that as a result of the fraudulent scheme, false claims must have been submitted.");

United States ex rel. Barmak v. Sutter Corp., 2003 WL 21436213, at *6 (S.D.N.Y. June 20,

2003) (Duffy, J.) (adopting Clausen and concluding that "[t]he Relator is not entitled to a lesser

pleading requirement because [it] failed to exhausted all avenues for obtaining the detailed information lacking in the complaint.").

Relying on Clausen and Karvelas, the Sixth Circuit has tailored the requirements of Rule 9(b) for complaints that allege a long-running scheme to violate the FCA, concluding that they need not allege the details of each and every false claim, but may instead come forward with examples of allegedly false claims. See United States ex rel. Bledsoe v. Community Health Systems, Inc., 501 F.3d 493 (6th Cir. 2007).  First, Bledsoe concluded that "an allegation of an actual false claim is a necessary element of a FCA violation."  Id. at 504 & n.12.  It next observed that when a large entity is an FCA defendant, a complaint need not identify the individual persons who allegedly filed false claims.  Id. at 506-09.  As to a lengthy and complex scheme, there are "valid reasons for not requiring a relator to plead every specific instance of fraud where the relator's allegations encompass many allegedly false claims over a substantial period of time."  Id. at 509.  Logistically, it would be "ungainly" or "impossible" for a complaint to identify each incident of fraud in a years-long, wide-ranging scheme.  Id.  "For this reason, we hold that where a relator pleads a complex and far-reaching fraudulent scheme with particularity, and provides examples of specific false claims submitted to the government pursuant to that scheme, a relator may proceed to discovery on the entire fraudulent scheme."  Id. at 510.  These examples should be illustrative, "such that a materially similar set of claims could have been produced with a reasonable probability by a random draw from the total pool of all claims."  Id. at 511.  It remains incumbent on the relator to allege each alleged scheme with particularity.  Id. at 510.  Bledsoe stated that such an approach "strik[es] an appropriate balance" of safeguarding a defendant's Rule 9(b) protections without imposing "onerous pleading requirements" on a relator.  Id. at 511.

In <u>United States v. Wells Fargo Bank, N.A.</u>, 972 F. Supp. 2d 593, 616 (S.D.N.Y. 2013), Judge Furman applied <u>Bledsoe</u> to "two schemes involving thousands of false or fraudulent claims over a period of almost ten years . . . ."  Quoting extensively from the Sixth Circuit's <u>Bledsoe</u> decision, Judge Furman concluded that it was sufficient to plead each alleged scheme with particularity, provided that the complaint also provided examples of specific false claims.  <u>Id.</u> at 616-18.  Examples of fraudulent statements were necessary to permit a defendant "'to infer with reasonable accuracy the precise claims at issue . . . .'"  <u>Id.</u> at 616 (quoting <u>Bledsoe</u>, 501 F.3d at 511).  Judge Furman concluded that the complaint in <u>Wells Fargo</u> satisfied Rule 9(b) by providing ten examples of false claims (among the "thousands" alleged) for one scheme, "a list of <u>all</u> false claims" for the second scheme, and by pleading with particularity the existence of both alleged schemes.  <u>Id.</u> at 617-18.[6]

Similarly, in a thorough opinion that discusses many of the above-cited authorities, Judge McMahon recently concluded that it is insufficient to allege a fraudulent scheme unless the complaint alleges with particularity the existence and contents of false claims.  <u>United States ex rel. Kester v. Novartis Pharmas. Corp.</u>, __ F. Supp. 2d __, 2014 WL 2324465 (S.D.N.Y. May 29, 2014).  Noting that the Second Circuit has not yet spoken to whether a complaint must allege the particulars of a false claim, Judge McMahon surveyed <u>Clausen</u>, <u>Grubbs</u>, and <u>Karvelas</u>, before concluding that "the <u>Grubbs</u> standard borders on requiring no particularity for the 'claim' element at all.  It allows the plaintiff to make fairly conclusory

---

[6] The <u>Bledsoe</u>-style approach has been applied by other district courts in the Second Circuit.  <u>See</u> <u>United States v. Movtady</u>, __ F. Supp. 2d __, 2014 WL 1357330, at *6 (S.D.N.Y. Apr. 7, 2014) (Furman, J.) (government alleged FCA violation by pleading scheme with particularity and providing examples of false claims); <u>Morgan ex rel. United States v. Science Applications International Corp.</u>, 2008 WL 2566747, at *5 (S.D.N.Y. June 26, 2008) (Daniels, J.) (relator failed to satisfy Rule 9(b) because "[t]hey do not cite to a single identifiable record or billing submission that they claim to be false, or give a single example of when a purportedly false claim was presented for payment by a particular defendant at a specific time.").

allegations that claims were submitted for medical services pursuant to standard billing practice." Id. at *11.  Judge McMahon's Kester opinion concluded that "[i]n the judgment of this Court, it seems highly unlikely that the Second Circuit would adopt the Grubbs rule."  Id. at *13.  Instead, Kester adopted the approach of Karvelas, requiring a complaint to allege either representative examples of false claims or "a high enough degree of particularity" to identify false claims.  Id. at *15-17.  The Kester opinion concluded that the approach adopted by Karvelas "weeds out . . . plaintiffs who are merely speculating that false claims might have been submitted to the government," and comports with the particularity safeguards of Rule 9(b).  Id. at *12.

This Court agrees that Grubbs would likely not be accepted as the law of this Circuit.  Clausen and Karvelas are more consistent with decades of Second Circuit precedent. [7] In the right case, Bledsoe-type sampling may nudge a claim over the Rule 9(b) line.  That may depend on the nature of the fraud alleged, the number and type of examples in relation to the universe of claims, and what can be truthfully alleged about the relationship of the examples to that universe – i.e., does the entirety of the universe or merely some follow the examples.  As will be seen, there has been no serious effort to meet Clausen, Karvelas or Bledsoe, and thus this Court comfortable concludes that the Complaint does not satisfy Rule 9(b).[8]

---

[7] The Second Circuit has applied Rule 9(b) to fraud claims in numerous contexts.  See, e.g., Cohen v. S.A.C. Trading Corp., 711 F.3d 353, 359 (2d Cir. 2013) (fraudulent predicate acts in support of a RICO claim); Janese v. Fay, 692 F.3d 221, 228 (2d Cir. 2012) (fraudulent breach of fiduciary duty in ERISA action); Anschutz Corp., 690 F.3d at 108 (Private Securities Litigation Reform Act of 1995); Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 143 (2d Cir. 2011) (common-law fraud); In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 692-94 (2d Cir. 2009) (fraudulent anti-competitive filings with the United States Patent and Trademark Office); Stern v. Gen. Electric Co., 924 F.2d 472, 476 (2d Cir. 1991) (shareholder derivative suit alleging directors' bad faith); Atlanta Shipping Corp. v. Chemical Bank, 818 F.2d 240, 251 (2d Cir. 1987) (allegation of fraudulent conveyance under New York Debtor & Creditor Law).

[8] In its relatively brief discussions of Rule 9(b)'s application to the FCA, the Second Circuit has not suggested that the FCA allows for the pleading variance applied by the Grubbs line of authority.  Although a summary order, Wood rejected the relator's contention that "a relaxed pleading standard" should apply, and noted that the Complaint failed to satisfy Rule 9(b) because it "does not specifically reference any false records or statements . . . ."  328 Fed. Appx. at 747 n.1, 748.  It approvingly quoted the district court's observation that that the complaint did "'not cite to a single identifiable record or billing submission they claim to be false, or give a single example of when a

To understand why this Court believes that Rule 9(b) requires particularized allegations that go toward the filing of false claims, it may be useful to consider one example of the Complaint's theories of liability, and the questions that remain when the relator fails to allege the circumstances of the filings or any representative claims.  According to the Complaint, from 1996 to 2006, the Hospital's physicians "filed approximately 355,000 CMS 1500 Forms that falsely stated such medical services were performed in private office settings – and not in hospital-based settings – and thereby intentionally caused Medicare to over-reimburse such physicians by approximately $8,500,000."  (Compl't ¶¶ 162-67.)  The Complaint asserts that these CMS 1500 forms included coded entries that denoted places of services, with an "11" code for office-based settings and a "22" or hospital settings.  (Compl't ¶ 165.)  The Complaint asserts that the Hospital and its physicians "persistently and deliberately misrepresented" that services were performed in private offices (Code 11) when they actually were performed in hospitals (Code 22).  (Compl't ¶ 165.)  But the Complaint does not set forth the actual contents or filings of any of the "approximately 355,000 CMS 1500 Forms."  There is not a single example of an identified physician providing a service to a patient in a hospital-based setting and then falsely coding the CMS 1500 Form with a Code 11 (private office) instead of a Code 22 (hospital).

How can a hospital reasonably be expected to frame an answer to such a claim?  A prudent party responding to an allegation that it had falsely stated the location of where a physician rendered a service would want to know where the physician was that day.  Had he or she been in his or her office, or at the hospital, or both?  Stating that the Hospital lied to the federal government more than 350,000 times about where services were rendered makes for a

---

purportedly false claim was presented for payment by a particular defendant at a specific time.'"  Id. at 750 (quoting Wood v. Applied Research Assocs., Inc., 2008 WL 2566728, at *5.  While Wood is a summary order and lacks precedential value, it suggests that the Second Circuit has not adopted the relaxed pleading standard set forth in Grubbs.

useful club in a claimant's hands, but it does not provide the particularity that Rule 9(b) requires.

Fraud is a serious allegation, and Rule 9(b) provides meaningful protection against blunderbuss

claims of fraud.  See generally Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004) (Rule 9(b)

"serves to 'provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's

reputation from improvident charges of wrongdoing, and to protect a defendant against the

institution of a strike suit.'") (quoting O'Brien v. Nat'l Property Analysts Partners, 936 F.2d 674,

676 (2d Cir. 1991)).

It is not a satisfactory answer that Corporate Compliance lacks the information to

address these questions.  See Nathan, 707 F.3d at 458 (acknowledging "practical challenges"

when "a relator may not have independent access to records . . . and where privacy laws may

pose a barrier to obtaining such information without court involvement."); Clausen, 290 F.3d at

1314 n.25 (noting that government entities, and not just claims' submitters, have necessary

documentation); Peterson v. Community General Hospital, 2003 WL 262515, at *2 (N.D. Ill.

Feb. 7, 2003) (documentation is not within defendants' exclusive possession because "the claims

at issue were submitted to the government."); cf. Kester, 2014 WL 2324465, at *12 (Rule 9(b)

"discourage[es] the filing of suits as a pretext for the discovery of unknown wrongs.").

Because the Complaint fails to allege with particularity the filing of any false

claim, it fails to satisfy the pleading requirements of Rule 9(b).

III.   The Complaint Fails to Satisfy Rule 9(b) in Several Other Specific
Respects.

Throughout, many of the allegations are conclusory.  Corporate Compliance

repeatedly fails to distinguish between the individual defendants, thereby failing to satisfy Rule

9(b).  Other allegations purport to reflect conduct that is merely "consistent with" fraud (Compl't

¶ 100), but allegations of conduct "consistent with" liability fail to satisfy both Rule 9(b) and

<u>Twombly</u>'s instruction that a plausible complaint must "nudge[ ] [plaintiffs'] claims across the line from conceivable to plausible . . . ."  550 U.S. at 570.  Additionally, the Complaint fails to distinguish between express and implied theories of false certification, and misapplies the Second Circuit's standard for liability under an implied theory of false certification.

The Court addresses each pleading infirmity.

> A.  The Complaint Has Not Alleged an Actionable Theory of False Legal
>     <u>Certification.</u>

The allegations concerning express and implied certification are vague, do not plead fraud with particularity and fail to give the defendants notice of the claims against them.

As an initial matter, the Complaint alleges that the defendants' false claims were "accompanied by an express <u>or</u> implied certification."  (Compl't ¶ 181; emphasis added.)  Despite the different legal standards governing these two types of false legal certification, the Complaint does not distinguish between them.  It merely alleges that the defendants either expressly or impliedly submitted false legal certifications.  This does not give notice of which theory of liability the relator asserts.  It therefore fails to state a claim of false legal certification.  <u>See generally</u> <u>Anschutz Corp.</u>, 690 F.3d at 108.

Additionally, the Complaint fails to allege that defendants submitted either express or implied false certifications.  The FCA "was not designed for use as a blunt instrument to enforce compliance with all medical regulations – but rather only those regulations that are a precondition to payment . . . ."  <u>Mikes</u>, 274 F.3d at 699.  "In other words, not every instance in which a false representation of compliance with a regulatory regime is made will lead to liability."  <u>United States ex rel. Kirk v. Schindler Elevator Corp.</u>, 601 F.3d 94, 114 (2d Cir.

2010), rev'd on other grounds, Schindler Elevator Corp. v. United States ex rel. Kirk, 131 S. Ct. 1885 (2011).[9]

   An express theory of false legal certification applies when a defendant explicitly misstates compliance with a law or regulation.  Mikes, 274 F.3d at 698.  An implied false legal certification, by contrast, occurs when the mere act of submitting a claim for reimbursement implies compliance with rules that are a precondition for payment.  Id. at 699.  "[I]mplied false certification is appropriately applied only when the underlying statute or regulation upon which the plaintiff relies expressly states the provider must comply in order to be paid."  Id. at 700 (emphasis in original); see also United States ex rel. Associates against Outlier Fraud v. Huron Consulting Grp., Inc., 929 F. Supp. 2d 245, 255-56 (S.D.N.Y. 2013) (Rakoff, J.) (granting summary judgment to the defendant when "[t]he Court has been made aware of no statute or regulation that expressly" forbids Medicare reimbursement for alleged misconduct); United States Anti-Discrimination Center of Metro New York, Inc. v. Westchester County, N.Y., 668 F. Supp. 2d 548, 566 (S.D.N.Y. 2009) (Cote, J.) (provision of HUD statute providing that grants "shall be made only if the grantee certifies" satisfaction of the Civil Rights Act of 1964 and the Fair Housing Act allowed for claim of implied false legal certification).  "[C]aution should be exercised" by courts "not to read this theory expansively or out of context."  Mikes, 274 F.3d at 699.

   United States ex rel. Conner v. Salina Regional Health Center, Inc., 543 F.3d 1211, 1221 (10th Cir. 2008), concluded that the FCA "does not require perfect compliance as an absolute condition to receiving Medicare payments for services rendered."  It noted that the HHS has enacted a series of regulations that govern remedial procedures if an accredited Medicare

---

[9] Kirk also contrasted legal certification with a factually false certification, such as seeking reimbursement for goods and services that were never actually provided.  601 F.3d at 113-14.

provider does not comply fully with Medicare's regulatory requirements.  Id. at 1220-21.  Citing

to Mikes, the Tenth Circuit concluded that if the FCA required compliance with every existing

regulatory requirement for Medicare payment, qui tam relators

> could prevent the government from proceeding deliberately through
> the carefully crafted remedial process and could demand damages
> far in excess of the entire value of Medicare services performed by
> a hospital.  If successful, the consequences of such an action would
> likely be catastrophic for hospitals that provide medical services to
> the financially disadvantaged and the elderly.  . . .  It is therefore
> with good reason that the agencies of the federal government, rather
> than the courts, manage Medicare participation in the first instance
> in cooperation with the states and accreditation organizations.

Id. at 1221.

But the Court does not need to rely on the policy implications weighed by the

Tenth Circuit in Conner.  First, to the extent that the Complaint purports to assert a theory of

express false legal certification, it has not identified any express misstatements of compliance by

the Hospital or any other defendant.  Mikes, 274 F.3d at 698.  The Complaint therefore fails to

state a claim of express false legal certification.

Second, as to implied false legal certification, the Complaint does not cite to

"underlying statute or regulation" that "expressly states the provider must comply [with] in order

to be paid."  Id. at 700 (emphasis in original).  It relies only on generalized certifications in

Medicaid and Medicare reimbursement forms.  The Complaint quotes a series of certifications

that were required of the Hospital.  In submitting a cost report to Medicare Part A, an official

was required to certify familiarity "with the laws and regulations regarding the provision of

health care services, and that the services identified in this cost report were provided in

compliance with such laws and regulations."  (Compl't ¶ 42.)  CMS-1500 forms require the

official to certify that "I understand that payment and satisfaction of this claim will be from

Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws." (Compl't ¶ 49.)  Three different certification statements required to receive reimbursement under New York State Medicaid include acknowledgement that furnishing false information or claims may lead to fines or prosecution, and that the filer is subject to the laws and regulations of the State of New York. (Compl't ¶¶ 57-58, 60.)  These generalized certifications of legal compliance do not satisfy the standard for alleging implied false legal certification as set forth in <u>Mikes</u>.

Corporate Compliance notes that the Anti-Kickback Statute was recently amended to explicitly state that a violation of its terms is actionable under the FCA.  <u>See</u> 42 U.S.C. § 1320a-7b(g).  However, the statute was amended in 2010, and became effective on January 1, 2011.  H.R. 3590, 111th Cong. § 6508(a) (2010).  The revised statute does not provide for retroactive application.  The Complaint makes no allegations of "kickbacks" that occurred after January 1, 2011.  Therefore, the 2010 amendment to section 1320a-7b does not salvage the Complaint's theory of implied false certification.  Moreover, for the reasons explained below, the Complaint fails to allege with particularity the existence of physician "kickbacks."

The Complaint fails to allege an actionable theory of either express or implied false legal certification.

B.  The Complaint's Blanket Allegations of Liability on the Part of All <u>"Defendants" Fail to Satisfy Rule 9(b).</u>

"Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'"  <u>Mills v. Polar Molecular Corp.</u>, 12 F.3d 1170, 1175 (2d Cir. 1993).  "Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud."  <u>DiVittoria v. Equidyne Extractive Indus., Inc.</u>, 822 F.2d 1242, 1247 (2d Cir. 1987).  Because

Rule 9(b) requires that a defendant receive fair notice of the fraud claim, "a plaintiff alleging a claim sounding in fraud against multiple defendants under Rule 9(b) must 'plead with particularity by setting forth separately the acts complained of by each defendant.'"  Ningbo Prods. Import & Export Co. v. Eliau, 2011 WL 5142756, at *7 (S.D.N.Y. Oct. 31, 2011) (quoting Sofi Classic S.A. de C.V. v. Hurowitz, 444 F.Supp.2d 231, 248 (S.D.N.Y. 2006)); see also Ritani, LLC v. Aghjayan, 970 F. Supp. 2d 232, 250 (S.D.N.Y. 2013) (Sweet, J.) ("To begin with, Rule 9(b) is not satisfied by a complaint in which defendants are clumped together in vague allegations.") (quotation marks omitted).

              The Complaint defines the "Defendants" to include the Hospital, Reynolds and Kemp.  (Compl't ¶ 1.)  All nine causes of action assert claims against all three of these "Defendants," collectively, including Kemp, the outside billing company executive who allegedly paid kickbacks to Reynolds in exchange for Hospital business.  (Compl't ¶¶ 185, 187, 190, 195-98, 201-05, 208-12, 215-19; 221; 226; 231-33.)  The three defendants all are alleged to be liable on each count, even where the substantive allegations claim wrongdoing solely by the Hospital.  For instance, Count One purports to "seek[ ] relief against the Defendants" (Compl't ¶ 185) for violating 31 U.S.C. § 3729(a)(1)(A) (2007), which makes it unlawful to "knowingly present[ ], or cause[ ] to be presented . . . a false or fraudulent claim for payment or approval." But the Count makes allegations only as to the conduct and state-of-mind of the defendant Hospital.  (Compl't ¶¶ 185-88.)  The same is true for Count Two (Compl't ¶¶ 190-93), Count Seven (Compl't ¶¶ 221-24), Count Eight (Compl't ¶¶ 226-29) and Count Nine (Compl't ¶¶ 231-34).  Under Count Three, Kemp is alleged to be liable under the Stark Law (Compl't ¶ 197), even though the Stark Law governs physician self-referrals, an issue where no allegations implicate Kemp.

The Complaint's nine causes of action make blanket allegations concerning the alleged misconduct of all three defendants, and therefore fail to satisfy Rule 9(b).  They fail to distinguish between the defendants' roles in the various alleged schemes.  Corporate Compliance therefore has not alleged fraud with particularity.

C.  **The Complaint Fails to Allege "Kickbacks" to the Hospital's Physicians.**

Corporate Compliance contends that the remuneration paid to the Hospital's physicians violated the Stark Law and the Anti-Kickback Statute.  (See generally Compl't ¶¶ 96-137.)  Its allegations are flawed in the following respects.

1.  **The Complaint Does Not Link Physicians' Base Salaries to the Derivative Revenue that They Generated.**

The Complaint asserts that the base salaries of physicians were calculated based on the value of "derivative revenue" the Hospital gained through that physician's referrals.  (Compl't ¶ 96.)  But the Complaint includes no allegations that support the existence of such a relationship.

The Complaint compares the salaries and responsibilities of two physicians.  Dr. Walter Bohne joined the Hospital staff in 1971, became Chief of the Foot and Ankle Service in 1982 and stepped down from that position in 2001.  (Compl't ¶ 98.)  By 2003, his base salary was $100,000.  (Compl't ¶ 100.)  The Complaint contrasts Bohne's circumstances with Dr. Edward Craig, described as "a prominent and successful surgeon" with a base salary of $750,000.  (Compl't ¶ 99.)  According to the Complaint, between 2002 and 2004, Bohne generated derivative revenue for the Hospital that ranged in annual value between approximately $1 million and $1.2 million.  (Compl't ¶¶ 99.)

As characterized in the Complaint, "The larger salary and more favorable split for Dr. Craig is consistent with the statements made above whereby the compensation of a given physician is directly correlated with the referrals or Derivative Revenue [the Hospital] received from that physician."  (Compl't ¶ 100.)  But an allegation that conduct "is consistent with" liability does not satisfy Rule 9(b), or even the requirements of <u>Twombly</u> and <u>Iqbal</u>, which require allegations that "nudge[ ] [plaintiffs'] claims across the line from conceivable to plausible . . . ."  <u>Twombly</u>, 550 U.S. at 570.  Alleging that certain conduct is "consistent with" liability is little different than alleging that liability is "conceivable."

Moreover, these allegations merely depicted a salary variance between two physicians employed by the same Hospital.  Allegedly, one "prominent and successful surgeon" earned significantly more than a second physician who had been employed by the Hospital for more than 30 years and had recently stepped down from a leadership role.  (Compl't ¶¶ 98-100.)  The Complaint does not allege that the two physicians carried comparable workloads or had similar practices.  It does not allege with particularity that the two were similarly situated, to a point where their salary difference could be explained only by their generation of derivative revenue.  The allegations assert nothing more than a salary difference.

The relator, Corporate Compliance, feigns ignorance of the fundamentals of economics.  The Complaint impliedly asks why else, except for kickbacks, would a hospital pay more to a surgeon who generated more than $1 million a year in "derivative revenue" than to another fine doctor with 30 years of experience and a leadership role within the institution?  A hospital that takes into account in its compensation decisions the doctor's overall worth to the hospital has not engaged in a corrupt act, even when it seeks reimbursement for services from the government.  It certainly does not bespeak of fraud or nefarious conduct, such as a "kickback."

Apart from the lack of particularity, the claim, as presently pleaded, is implausible within the meaning of Twombly and Iqbal.

   The Complaint is not saved by its allegations that physicians were "grossly" overcompensated in light of the revenue that they generated through professional billings, and that physicians received excessive salaries in order to induce referrals for "derivative revenue." (Compl't ¶¶ 101-03, 106-11.)  The Complaint identifies twelve physicians whose salaries allegedly exceeded their profitability to the Hospital in the year 2002, by an aggregate amount of $1,222,051.  (Compl't ¶ 107.)  As an example, it also analyzes the 2002 salary of Dr. Roger Widmann, a pediatric surgeon, and asserts that the Hospital incurred a loss of $252,700 on Widmann's salary.  (Compl't ¶ 102.)  But the Complaint's allegations that alleged salary overpayment was tied to "derivative revenue" are purely conclusory.  (Compl't ¶¶ 101 (unsupported allegation the Hospital "was willing to incur these 'losses' because these same physicians brought in millions of dollars in Derivative Revenue."); 110 (unsupported allegation that "it was clear that" a doctor was generating deficient derivative revenue); 111 (unsupported allegation that a doctor generated a "significant amount" of derivative revenue).  Here, the Complaint does not concern itself with the subjective considerations it found so important in the case of the purportedly underpaid Dr. Bohne, such as years of service and leadership positions. Assuming the truth of the conclusory allegation that these physicians were overpaid, the Complaint fails to connect the physicians' base salary with derivative revenue, and makes no particularized, factual allegations as to the derivative revenue generated by any physician.

   The Complaint's allegations as to the relationship between derivative revenue and physician base salary therefore fails to satisfy Rule 9(b).

2.   Corporate Compliance Makes Only Vague Allegations
Concerning the Role of Derivative Revenue in Negotiating
<u>Physician Salaries.</u>

The Second Amended Complaint, which was filed under seal on or about June 2,

2011, alleged that while it was "not explicitly stated in meetings, the main factor in negotiating

base salaries and the professional fee split was the magnitude of associated hospital revenue

generated by each physician."  (Docket # 53 ¶ 100.)  The now-operative Fourth Amended

Complaint alleges that the former Associate Vice President of Physician Services "can state that

the main factor in negotiating base salaries and the professional fee split was the magnitude of

associated hospital revenue generated by each physician."  (Compl't ¶ 109.)

This assertion, as articulated differently in two versions of the Complaint, does

not explain how this individual concluded that "derivative revenue" was "the main factor" in

salary negotiations, when the issue was never "explicitly stated."  Did this Hospital executive

review correspondence or documents that led to this conclusion?  Was there a widely accepted

understanding among physicians or administrators that this was the case?  Was it a matter of

subjective inference on the part of this executive?  The Complaint alleges, <u>ipse</u> <u>dixit</u>, that

derivative revenue was "the main factor" in negotiating physician salary, while disclaiming that

the matter was ever explicitly discussed.  This is akin to making an allegation upon information

and belief, and such an allegation does not satisfy Rule 9(b) unless "accompanied by a statement

of the facts upon which the belief is based."  <u>First Capital Asset Mgt., Inc. v. Satinwood, Inc.,</u>

385 F.3d 159, 179 (2d Cir. 2004) (quotation marks omitted).

The Complaint's unsupported allegations concerning physician salary

negotiations do not satisfy Rule 9(b).

3.  The Complaint Does Not Allege the Existence of a Single Physician Referral that Brought Derivative Revenue to the <u>Hospital.</u>

The Complaint makes no allegations as to the amount of derivative revenue generated by any physician.  It fails to allege the existence of any referrals that were made by any physician that brought derivative revenue to the Hospital.  While such specific allegations may be difficult to make without the benefit of discovery, in light of the Complaint's other pleading infirmities as to alleged physician "kickbacks" and Hospital "derivative revenue," the omission of these facts further underscores the Complaint's failure to plead with particularity violations of the Anti-Kickback Statute or the Stark Law.

4.  The Complaint Alleges that the Hospital Was Concerned about <u>Physician Salaries and Undertook Cost-Cutting Measures.</u>

According to the Complaint, in 2002 and 2003, the Hospital, under Reynolds's direction, began a cost-cutting initiative that included consideration of excessive physician salaries.  (Compl't ¶¶ 104-07.)  A Vice President of Physician Services drafted a memo titled "Contract Physician Profitability Improvement Plan" and a presentation titled "Profitability Initiatives," which outlined the Hospital's losses on physician salaries.  (Compl't ¶¶ 105-06.) The same Vice President attempted to renegotiate physician contracts in order "to push doctors" into the status of independent physician rather than contract physician.  (Compl't ¶ 109.)

The Complaint alleges that these negotiations were somehow improper, because they encouraged physicians with lower derivative revenue into independent status.  (Compl't ¶¶ 110-11.)  As examples, it compares Dr. Edward Athanasian, who generated $286,150 in professional fees in 2002 and $111,535 in 2003, with Dr. Craig, who generated between approximately $1 million and $1.2 million in fee revenue between 2002 and 2004.  (Compl't ¶¶ 110-11.)  According to the Complaint, Dr. Athanasian was "pushed" into independent status

because he generated lower derivative revenue, while Dr. Craig was permitted to retain contract

status because he generated lucrative derivative revenue.  (Compl't ¶¶ 110-11.)

But, again, these allegations fail to plead with particularity the existence of

kickbacks or improper referrals.  They do not allege the value of derivative revenue generated by

either Dr. Athanasian or Dr. Craig.  They assert in conclusory fashion that the Hospital's efforts

to decrease physician salaries were improper, while at the same time alleging that the Hospital's

overpayment of physicians is also evidence of fraud.  If anything, the Complaint asserts that in or

about 2002 and 2003, the Hospital attempted to rein in the very salaries that Corporate

Compliance deems to have been exorbitant.  (Compl't ¶¶ 105-11.)  The Complaint's assertion

that these salaries reflect evidence of kickbacks paid in exchange for derivative revenue are

conclusory.  (Compl't ¶¶ 104, 110-11.)

In this Complaint, the Hospital cannot win.  It is fraud and unlawful if it pays too

much in physician compensation, but also fraud and unlawful if it tries to rein in physician

compensation.  If the Complaint's defining difference is the Hospital's purported obsession with

"derivative revenue" to the exclusion of other compensation considerations, it has done a poor

job of plausibly alleging it in a non-conclusory manner and with particularity.

5.  The Complaint's Assertions Concerning CARA Payments Do Not
Allege Physician Kickbacks.

According to Corporate Compliance, "The amount of the CARA payments

themselves creates FCA liability."  (Compl't ¶ 121.)  It asserts that "the majority" of the

Hospital's doctors received an annual $80,000 CARA payment, while some received more.

(Compl't ¶ 121.)  The Complaint asserts that a flat-fee payment "is troubling" because "it can

easily be proven" that the Hospital's doctors had different CARA-related workloads.  (Compl't ¶

121.)

But, again, the Complaint does not set forth any allegations that link CARA payments to derivative revenue and Hospital referrals. As the Hospital notes in its memorandum of law, while the Complaint alleges that the physicians had limited workloads as to teaching and administrative duties, it also makes no allegations as to physicians' research responsibilities, which are alleged to be another component of CARA payments. (Hosp. Mem. at 25.) The Complaint does not identify physicians who allegedly received CARA payments in exchange for making referrals for Hospital services, or physicians who allegedly failed to perform CARA responsibilities. It identifies one "senior" independent physician who successfully demanded "an increase in his salary of $80,000" for providing clinical services in place of other independent physicians. (Compl't ¶ 117.) It asserts that the only physician time records concerning CARA activities "were not completed appropriately," but as support for this observation, alleges only that "clerks chas[ed] doctors around to obtain the doctors [sic] signatures." (Compl't ¶ 123.)

As to allegations that the Hospital's administration was "top-heavy," the Complaint does not allege with particularity why a "top-heavy" administration reflects a practice of paying kickbacks to physicians, as opposed to some other organizing principle of whatever merit. (Compl't ¶ 132.) The Complaint also asserts that CARA payments do not reflect fair market value, but it includes no supporting allegations as to why this is the case; instead, it alleges that a former associate vice president of physician services "can testify" to that effect. (Compl't ¶¶ 120, 122,)

The Complaint negatively compares the administrative organization of the Hospital to the administration at Montefiore Hospital (Compl't ¶¶ 133-34), but it does not explain why Montefiore is relevant point of comparison for the Hospital's administrative structure. The Complaint alleges that the Hospital operates "in a highly competitive marketplace

for hospital services." (Compl't ¶ 80.) It identifies by name six hospitals that "compete directly" with the Hospital: New York-Presbyterian/Weill Cornell Medical Center, Lenox Hill Hospital, Mount Sinai Medical Center, NYU Langone Medical Center, Hospital for Joint Diseases and Beth Israel Medical Center. (Compl't ¶ 80.) Notably, Montefiore Hospital is not among them. The Complaint's allegations concerning Montefiore do not allege with particularity that the Hospital's organizational structure is somehow unlawful or improper, let alone that the CARA payments are kickbacks paid in exchange for physicians' derivative services referrals.

D. The Complaint Fails to Allege that the Hospital Had Knowledge of Vendor Kickbacks to Reynolds.

The Complaint fails to allege liability on the part of the Hospital as to Reynolds's kickback scheme involving defendant Kemp and PBC. The Complaint alleges that the Hospital was "grossly negligent and reckless in never discovering Reynolds's kickback schemes as its CFO, and then as its CEO." (Compl't ¶ 145.) Corporate Compliance argues that the Hospital should be liable for Reynolds's actions, asserting that he acted with apparent authority. (Opp. Mem. at 13 (citing United States v. Incorporate Village of Island Park, 888 F. Supp. 419, 438 (E.D.N.Y. 1995) (respondeat superior applies to the FCA when an employee has apparent authority and acted "at least in part, for the employer's benefit."))).

But the Complaint makes no allegations to support its conclusory assertion that the Hospital was grossly negligent or reckless in not discovering Reynolds's kickback schemes. (Compl't ¶ 145.) There is no allegation that Reynolds had the apparent authority to solicit kickbacks from PBC or any other vendor, and no allegation that the Hospital benefited from the kickbacks, which were allegedly paid directly to Reynolds's consulting company. (Compl't ¶ 142.) Indeed, the Complaint alleges that payments were "a kickback to Reynolds" and that "the artificially excessive fee for billing services contributed to the losses sustained by the Hospital

under the financial arrangements with Contract Physicians."  (Compl't ¶¶ 143, 148.)  Under Corporate Compliance's own allegations, the kickbacks were to the Hospital's detriment and for the benefit of Reynolds.  But the Complaint does not set forth how or why the vendor payments to Reynolds rendered any of the Hospital's particular claims for government reimbursement false or otherwise unlawful.

The Complaint fails to plausibly allege a claim against the Hospital by reason of Reynolds's scheme for personal enrichment.

E.   The Complaint Fails to Allege a Conspiracy to Violate the FCA.

The FCA makes it unlawful to "conspire[ ] to defraud the Government by getting a false or fraudulent claim allowed or paid. . . .:  31 U.S.C. § 3729(a)(3) (2007).  To state a conspiracy claim, "a relator must allege that '[1] the defendant knowingly conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States and [2] that one or more of the coconspirators performed any act to effect the object of the conspiracy.'" United States ex rel. Colucci v. Beth Israel Med. Center, 785 F. Supp. 2d 303, 310 (S.D.N.Y. 2011) (Chin, J.) (quoting United States v. Sforza, 2000 WL 1818686, at *5 (S.D.N.Y. Dec. 12, 2000) (Schwartz, J.)).  The Supreme Court has stated that an FCA conspiracy claim must be directed toward submission of a false claim to the government:

> [I]t is not enough for a plaintiff to show that the alleged conspirators agreed upon a fraud scheme that had the effect of causing a private entity to make payments using money obtained from the Government.  Instead, it must be shown that the conspirators intended 'to defraud the Government.'  Where the conduct that the conspirators are alleged to have agreed upon involved the making of a false record or statement, it must be shown that the conspirators had the purpose of 'getting' the false record or statement to bring about the Government's payment of a false or fraudulent claim.

Allison Engine Co., 553 U.S. at 672-73.  Conspiracy claims under the FCA must be pleaded with particularity under Rule 9(b).  United States ex rel. Gagne v. City of Worcester, 565 F.3d 40, 45 (1st Cir. 2009) (collecting cases).

In each of its three conspiracy claims, the Complaint alleges that the "Defendants entered into one or more conspiracies to defraud the United States through the submission of false and fraudulent claims and through the payment received by Defendants on those false and fraudulent claims."  (Compl't ¶¶ 201, 208, 215.)  Counts Four, Five and Six allege that the defendants entered into a conspiracy to violate the FCA.  Count Four alleges a conspiracy to prepare false cost reports and other documents.  (Compl't ¶ 202.)  Count Five alleges a conspiracy to prepare false CMS-1500 forms.  (Compl't ¶ 209.)  Count Six alleges a conspiracy to prepare documents relating to "Defendants' illegal kickback scheme," and submitting reports to the United States for approval and payment.  (Compl't ¶ 216.)

The Complaint fails to plead with particularity that the defendants conspired to violate the FCA.  Again, the Complaint asserts liability against the "Defendants," which is a defined term that encompasses the Hospital, Reynolds and Kemp.  (Compl't ¶¶ 1, 201, 208, 215.) It asserts that these three defendants "entered into one or more conspiracies to defraud the United States through the submission of false and fraudulent claims . . . ."  (Compl't ¶¶ 201, 208, 215.) It does not identify the purported roles of the three defendants.  Its generalized allegation that they entered "into one or more conspiracies" does not identify the alleged conspiracies with particularity.  The Complaint also does not allege with particularity when these conspiracies began.

In opposition, Corporate Compliance contends that it is adequate to allege that the Hospital conspired with its physicians "to get false claims paid by the Government."  (Opp.

- 44 -

Mem. at 15.)  But the Complaint does not allege – either plausibly or with particularity – active or knowing participation by the Hospital's physicians.  The "specific examples" cited by Corporate Compliance (Opp. Mem. at 15) consist of the previously-discussed, unsupported allegation that physician referrals were "the main factor" in negotiating base salaries (Compl't ¶ 109) and a conclusory allegation that the Hospital did not convert Craig's status at the Hospital from a contract physician to an independent physician because he generated "a significant amount" of derivative revenue – apparently implying that he was retained on contract status in order to induce referrals.  (Compl't ¶ 111.)  Even assuming <u>arguendo</u> that these conclusory assertions plausibly alleged that the Hospital considered physicians' derivative revenue when negotiating base salaries, they do not allege that the physicians "knowingly conspired" with the Hospital or others "to get a false or fraudulent claim allowed or paid by the United States . . . ." <u>Colucci</u>, 785 F. Supp. 2d at 310.

Corporate Compliance has therefore failed to allege a conspiracy to violate the FCA with the particularity required by Rule 9(b).

IV.  Corporate Compliance's Application for a Subpoena against the <u>United States Is Denied.</u>

Corporate Compliance "respectfully requests that the Court exercise its discretion in favor of allowing Relator to issue a subpoena to the Government for the CID Documents to amend its Complaint" in the event that "the Court finds the Complaint insufficient in any fashion . . . ."  (Opp. Mem. at 16.)  It seeks leave to amend the Complaint to incorporate facts currently in the possession of the United States.  (Opp. Mem. at 16-17.)  The application for a subpoena and to amend the Complaint is denied.

As noted, Corporate Compliance reviewed certain materials that the Hospital produced to the United States in response to a CID.  (Opp. Mem. at 16.)  Corporate Compliance

argues that it "identified additional evidence which further supports the allegations that are already extensively laid out in the Complaint." (Opp. Mem. at 16.) It states that "after the Government declined to intervene in the case, per an agreement entered into with the Government, Relator returned these CID Documents to the Government and did not supplement the Complaint with the information contained therein." (Opp. Mem. at 16.) Corporate Compliance states that the CID documents include contracts with physicians; charts showing CARA payments and expenses; notes from meetings between Hospital administrators and physicians that "indicate" referrals were considered in salary negotiations; and profit-and-loss statements regarding physician salaries and expenses from 2002 through 2010. (Opp. Mem. at 17.)

Corporate Compliance has cited no authority for the proposition that it is "a recognized practice" (Opp. Mem. at 16) among the federal courts to issue a subpoena requiring the United States to produce materials to a qui tam relator.[10] A qui tam relator brings "suit on behalf of the United States government. As such, it acts neither as the real party in interest nor in a representative capacity." United States v. Quest Diagnostics Inc., 734 F.3d 154, 166 (2d Cir. 2013). As described in Corporate Compliance's memorandum of law, over a six-year period, the United States issued a CID to the Hospital and reviewed responsive documents. (Opp. Mem. at 1-2.) It provided Corporate Compliance with those documents under the express condition that it not supplement its pleadings with information obtained through the CID. (Opp. Mem. at 2.)

Corporate Compliance has cited no authority, and offers no rationale, as to why the United States should be compelled to produce documents to a private relator that purports to

---

[10] The authorities cited by Corporate Compliance recognize that a relator may include information obtained from non-parties, including information accessed from government entities, but none supports the issuance of subpoena to the United States. (Opp. Mem. at 16-17.)

be acting on the United States's behalf.  The United States is a real party in interest to this action; Corporate Compliance is not, and it has not provided the Court with any authority or rationale as to why the United States should be required – potentially against its will – to give Corporate Compliance access to additional materials obtained through the CID.

The relator's only request to re-plead the Fourth Amended Complaint in the event of dismissal is one that is coupled with a request that the Court allow a subpoena for the materials produced in response to the government's CID, to be followed by the incorporation of such materials into a Fifth Amended Complaint.  This case was filed in 2007.  The Court recognizes that time was consumed by the federal and state governments' reviews leading each to decline to pursue the case, but they declined to intervene in June 2013.  Corporate Compliance thereafter filed a Third Amended Complaint on November 18, 2013 and a Fourth Amended Complaint on January 8, 2014.  (Docket # 29, 59.)  Corporate Compliance made no request to this Court for access to the government's CID materials prior to filing these amended complaints.  (See, e.g., Docket # 51.)  Based on the relator's vague and inclusive descriptions of the CID materials (Opp. Mem. at 16-17), this Court will not allow the issuance of the subpoena, a matter first raised with the Court in opposition to the motion to dismiss the Fourth Amended Complaint.

CONCLUSION.

The defendants' motions to dismiss are GRANTED.  (Docket # 60, 64, 69.)

Corporate Compliance's applications to issue a subpoena against the United States and to file a Fifth Amended Complaint are denied.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
      August 7, 2014